UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

MARQUICE DONNELL SAVAGE, )
)
        Plaintiff, )
)
v. ) Case No. 23-CV-0126-CVE-CDL
)
SHYANNE DOBBERTIN, et al., )
)
        Defendants. )

**OPINION AND ORDER**

In this civil rights action, plaintiff Marquice Donnell Savage seeks relief under 42 U.S.C. § 1983, claiming that defendants Shyanne Dobbertin and Aaliyah Sanchez (collectively, "defendants"), both of whom are employed by the Tulsa County Sheriff's Office ("TCSO"), violated Savage's Fourteenth Amendment right to be free from the use of excessive force on April 18, 2021, while Savage was detained at the David L. Moss Criminal Justice Center in Tulsa, Oklahoma ("the jail"). Dkt. # 37. Before the Court is defendants' joint motion for summary judgment (Dkt. # 87). Defendants contend they are entitled to summary judgment based on the doctrine of qualified immunity. Dkt. # 87. Savage responded in opposition to the motion (Dkt. # 95), and defendants replied (Dkt. # 102). On consideration of the summary judgment record, the parties' arguments, and applicable law, the Court finds that defendants are entitled to qualified immunity and therefore grants summary judgment in their favor as to the Fourteenth Amendment excessive force claim.[1]

---

[1] Based on the grant of summary judgment in defendants' favor, the Court denies as moot Savage's motion for appointment of counsel (Dkt. # 106).

I.

The following facts are either undisputed or viewed in the light most favorable to Savage. Savage was arrested and booked into the jail in July 2020. Dkt. # 91-17, at 5.[2] Between July 15, 2020, and December 17, 2021, defendants served as detention officers at the jail. Dkt. # 91-6, at ¶ 3; Dkt. # 91-7, at ¶ 3. On four separate occasions between January 20, 2021, and March 6, 2021, Savage was written up for disorderly conduct, hindering an officer, refusal to lock down, and disobedience of a direct order. Dkt. ## 91-22, 91-23, 91-24, 91-25. Before April 18, 2021, Dobbertin and Sanchez each knew, either based on personal interactions with Savage or through common knowledge among detention staff, that Savage had a history of fighting with other inmates, disobeying orders of detention staff, and acting aggressively toward detention staff. Dkt. # 91-6, at ¶¶ 12-13; Dkt. # 91-7, at ¶ 10.

On the night of April 18, 2021, Corporal Dominique Edwards was the housing shift supervisor and was authorized to carry handcuffs and an electronic control device. Dkt. # 91-8, at ¶ 6; Dkt. # 91-14. Dobbertin was stationed at the booking desk in the booking area of the jail. Dkt. # 91-7, at ¶ 4. Sanchez was stationed at the classifications desk, located behind the booking desk. Dkt. # 91-6, at ¶ 4. The booking area is near J-Hall, but the hall is not visible from the booking desk or the classifications desk. Id. at ¶ 12; Dkt. # 91-6, at ¶ 15. Corporal Alicia Diaz was stationed at the operations desk at the end of J-Hall just outside the booking area. Dkt. # 91-9, at ¶ 9. The following diagram depicts these areas of the jail:

---

[2] For consistency and unless otherwise indicated, the Court's citations refer to the CM/ECF header pagination. Defendants submitted a notice of errata on December 30, 2024 (Dkt. # 91), notifying the Court that the attachments filed with their motion for summary judgment were filed out of order, that the attachments were mailed to Savage in the correct order with the motion for summary judgment, and that the attachments submitted with the notice of errata are correctly ordered and should replace the attachments submitted with Dkt. # 87. To avoid confusion, the Court's citations refer to the correctly ordered attachments submitted with the notice of errata.



Dkt. # 87, at 13; Dkt. # 91-9, at ¶ 6. The distance from the pod J-9 exit door[3] and the middle of the vestibule of the holding cell next to the booking area is 590 feet. Dkt. # 91-9, at ¶¶ 7-8. At a relaxed pace, this distance is about a three-minute walk. Id.

On April 18, 2021, Savage was housed in a jail cell in pod J-9. Dkt. # 37, at 10;[4] Dkt. # 91-13 at 1; Dkt. # 91-14 at 1. Around 11:00 p.m., Savage had a verbal altercation with another inmate. Dkt. # 37, at 10; Dkt. # 91-1, at 12-13; Dkt. # 91-13, at 1. Ultimately, the pod officer

---

[3] In a jail setting, the word "pod" refers to a self-contained housing unit for multiple inmates which includes individual cells, a common area, and a station for the pod officer, all behind security controlled sallyport doors. Dkt. # 87, at 9 n.5.

[4] Because Savage appears without counsel, the Court includes some facts drawn from his verified amended complaint (Dkt. # 37), which the Court treats as an affidavit for purposes of the summary judgment proceeding. See Lantec, Inc., v. Novell, Inc., 306 F.3d 1003, 1019 (10th Cir. 2002) ("A district court may treat a verified complaint 'as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56[(c)(4)].'" (quoting Conaway v. Smith, 853 F.2d 789, 792 (10th Cir. 1988)). Under Rule 56(c)(4), an affidavit or declaration must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(c)(4). However, to the extent any allegations in the amended complaint "are merely conclusory," the Court disregards them. Conaway, 853 F.2d at 793.

called Edwards to escort Savage from pod J-9 to restrictive housing.[5]  Dkt. # 91-1, at 13; Dkt. # 91-13; Dkt. # 91-14.  Edwards told Savage to place his hands behind his back, Savage complied, and Edwards placed handcuffs on Savage's wrists.  Dkt. # 37 at 10; Dkt. # 91-1, at 20; Dkt. # 91-5.  Edwards escorted Savage out of pod J-9 and, as they walked down J-Hall toward the operations desk, Edwards "asked [Savage] to walk faster."  Dkt. # 37, at 10; Dkt. # 91-1 at 21.  Savage told Edwards he could not walk faster because he "had broken [his] left ankle a few years ago," he "had a plate and screws in [his] leg and ankle," he "was taking pain meds for these injuries," he "was in pain," and he had "an order from the doctor for a bottom bunk/bottom tier restriction."  Dkt. # 37, at 10; Dkt. # 91-1, at 21-22, 28.  Edwards stated that he did not care, placed his right hand on Savage's left arm, applied pressure on Savage's back, again directed Savage to walk faster, and "started pulling" Savage down the hall.  Id.; Dkt. # 91-14.  By forcing Savage to walk faster, Edwards "increased" the pain in Savage's left ankle, so Savage "pulled" or "snatched" his arm away from Edwards.  Dkt. # 37, at 10-11; Dkt. # 91-1, at 28; Dkt. # 91-14.  Edwards grabbed both of Savage's arms, picked Savage up, forcefully took him to the ground, placed his hands around Savage's neck, and began to strangle Savage, all while Savage was restrained with handcuffs

---

[5] Under TCSO policy, "[i]nmates may be placed in restrictive housing only for behaviors which pose a threat to the safety of themselves or others, or a clear threat to the safe and secure operations of the facility."  Dkt. # 91-30.

behind his back. Dkt. # 37, at 6, 10-11; Dkt. # 91-1, at 29, 31-32.[6] Edwards's actions "knocked the wind out of" Savage and caused more pain to his left ankle; Savage estimated his ankle pain after the takedown was ten on a scale of one to ten. Dkt. # 91-1, at 31-32.

After Edwards took Savage to the ground, Diaz, Dobbertin, and Sanchez "came running up" J-Hall. Dkt. # 37, at 6, 11, 13; Dkt. # 91-1, at 25-28; Dkt. # 91-14.[7] Edwards, Diaz, Sanchez, and Dobbertin lifted Savage up from the ground, "dragged" him down J-Hall—with his feet sometimes touching the ground and sometimes not touching the ground—and ignored his complaints that of pain in his left ankle, arms, and wrists. Dkt. # 37, at 6, 11, 13; Dkt. # 91-1, at 34, 36-39.[8] Near the operations desk, all four officers completely lifted Savage off the ground and carried him "from the operations desk all the way around to booking." Dkt. # 91-1, at 39. The

---

[6] In the amended complaint, Savage references a disciplinary report Edwards filed after this incident. Dkt. # 37, at 7. In that report, Edwards differently describes what occurred in J-Hall, stating that Savage pulled away from Edwards twice, that Edwards placed Savage against the wall each time Savage pulled away to permit Savage to calm down, that Savage then "began fighting back [Edwards] while in handcuffs, kneeing [Edwards] in the stomach," so Savage "was placed on the ground and complied when [Edwards] presented" his electronic control device. Dkt. # 91-15. This report identifies Diaz, Dobbertin, and Sanchez as other detention staff involved in the incident. Id. Edwards similarly described the incident in a use of force incident report. Dkt. # 91-14. Savage disputes that he resisted Edwards in the manner described. Dkt. # 95, at 3. But this dispute is immaterial because, under Savage's version of events, neither Dobbertin nor Sanchez was in J-Hall until after Edwards took Savage down to the ground. Dkt. # 37, at 6, 11, 13; Dkt. # 91-1 at 25-28.

[7] According to Edwards's use of force incident report, Diaz may have been present when Edwards took Savage to the ground. See Dkt. # 91-14 ("Diaz assist[ed] me with Savage as I took Savage to the ground. While on the ground Savage continued wrestling with us."). But Savage testified at his deposition that he and Edwards were alone in J-Hall when Edwards took him to the ground. Dkt. # 91-1, at 25-28. This dispute, however, is immaterial because neither version of these facts suggests that Dobbertin and Sanchez were present for the takedown.

[8] Savage's deposition testimony is unclear as to how all four officers held him as they "dragged" him down J-Hall, but he states that he "remember[s] all four officers dragging [him] down the hallway by their arms and hands" and that he thinks there were two officers on each side of him. Dkt. # 91-1, at 36-38.

5

group reached the holding cell vestibule in the booking area at 11:19 p.m. Dkt. # 91-2 (time-stamped still photo taken from surveillance video of holding vestibule). By that time, Savage was on his feet, Diaz and Edwards were using a two-person escort hold to walk Savage to the door of the holding cell,[9] and neither Dobbertin nor Sanchez was touching Savage. Id.; Dkt. # 91-1, at 40. Dobbertin opened the holding cell door, while Diaz and Edwards placed Savage, still in handcuffs, inside the holding cell. Id. Sanchez stood behind Savage, without touching him, as Edwards and Diaz placed him in the holding cell.[10] Id. The holding cell has a toilet located just behind a short privacy wall. Dkt. # 91-6, at ¶ 17; Dkt. # 91-7, at ¶ 15; Dkt. # 91-4 (still photo taken from holding cell surveillance video). After being placed in the holding cell and while still in handcuffs, Savage may have kicked the two-inch thick steel door of the holding cell. Dkt. # 87, at 19-20; Dkt. # 91-1, at 48-49 (Savage's deposition testimony stating that he "may have" kicked the door "to get

---

[9] According to the leader of the TCSO's special operations response team, who trains the jail's detention officers on defensive tactics, the "two-person uncooperative escort technique is an appropriate method of transporting an uncooperative or noncompliant inmate" within the jail. Dkt. # 91-31, at ¶¶ 2-4. This technique "can be used while the inmate walks and even when the inmate 'dead weights,'" or refuses to carry his own weight, "without any harm to the inmate or officers." Id. at ¶¶ 6, 8. While generally painless to the inmate, a non-compliant inmate being escorted with this technique may experience temporary shoulder pain. Id. at ¶ 6. As its name implies, this technique is performed by two officers and "involves placing an inmate's arms behind [his] back and handcuffing [his] wrists," then having each officer, with one officer standing on each side of the inmate, "loop" the officer's arm "through the inmate's elbow," and place the officer's hand on the back of the inmate's shoulder. Dkt. # 91-32, at ¶ 12; see also id. at pp. 5, 7, 9 (photo exhibits of escort technique).

[10] Based on their training, experience and understanding of TCSO policies, defendants state that when an inmate is removed from his pod to be placed into restrictive housing, an uncooperative or combative inmate first is taken to a holding cell to calm down, to be examined by medical staff and cleared for restrictive housing, and to await confirmation that a cell is available in restrictive housing. Dkt. # 91-6, at ¶ 7; Dkt. # 91-7, at ¶ 6.

someone's attention"); Dkt. # 91-8, at ¶ 10 (describing thickness and composition of holding cell door).[11]

At 11:43 p.m., Dobbertin entered the holding cell and removed Savage's handcuffs. Dkt. # 91-7, at ¶ 14. Two minutes later, the booking nurse, Angelia Lemons, entered the holding cell with Dobbertin. Id.; Dkt. # 91-11, at ¶¶ 4-5; Dkt. # 91-3. Lemons spoke with Savage for about ten minutes while she examined his pulse, temperature, blood oxygen levels, ankle and wrists. Dkt. # 91-11, at ¶ 4. Dobbertin placed Savage in handcuffs for about one minute while Lemons used a stethoscope to examine Savage's lungs and his breathing. Id. at 5. When Lemons finished this portion of the examination, Dobbertin again removed Savage's handcuffs. Id. Lemons observed that Savage was "ambulatory, agitated, and cooperative, and that his wrists had been cuffed behind his back." Id. at ¶ 6. Savage reported to Lemons that he had pain in his left ankle and in his wrists. Id. at ¶ 7. During her assessment of Savage, Lemons found "no objective evidence of any injury to [Savage's] wrists, arms, left ankle, or otherwise." Id. at ¶ 9. "Neither

---

[11] In their motion, defendants rely on surveillance video from the holding cell (Dkt. # 91-26) to allege that Savage stood on his left foot and kicked the holding cell door multiple times between 11:20 p.m. and 11:41 p.m. Dkt. # 87, at 19-20. Due to technical error, this Court was unable to view the video. Savage admits in his deposition that he may have kicked the door and that if there is video evidence of him kicking the door, he could not refute that evidence. Dkt. # 91-1, at 48-49. For purposes of the qualified immunity analysis, the Court accepts Savage's version that he may have kicked the door and does not rely on defendants' representation of the contents of the video. Notwithstanding the Court's inability to view the video, the fact that Savage may have kicked the door after being placed in the holding cell may be relevant to his ultimate ability to prove damages. But it is immaterial to the question of whether qualified immunity shields Dobbertin and Sanchez from liability.

[his] left ankle nor his wrists showed any sign of trauma or swelling." Id. at ¶ 10. Lemons medically cleared Savage for confinement in restrictive housing. Id. at ¶ 8.[12]

A second nurse, Janet Lance, examined Savage at 2:16 a.m. on April 19, 2021, after he was placed in restrictive housing. Dkt. # 91-12, at 13-14. Lance observed that Savage had one injury: a less than 0.5 cm superficial laceration on Savage's right thumb. Id. Lance noted Savage's complaints of bilateral wrist pain "from handcuffs being too tight earlier," but Lance observed no redness, swelling, or discoloration on Savage's wrists. Id. On April 21, 2021, Savage was examined in the medical unit for complaints of pain in his left side and left ankle. Id. at 15. The notes from that encounter indicate that Savage was able to walk, with a limp, that he reported level ten pain with or without placing weight on his left ankle, and that he requested orthopedic surgery to remove a broken screw from his ankle. Id. at 15-16. Savage's medical records indicate that he had an x-ray taken of his left ankle on January 21, 2021, after a "slight altercation with officers" at the jail, and that this x-ray revealed a healed fibula fracture from 2018 and a broken screw from his 2018 surgery. Id. at 22-23. Savage also had an x-ray taken of his left ankle on April 23, 2021, after the use of force at issue in this case, and this x-ray revealed "no new findings" and "[n]o need for an ortho[pedic] eval[uation]." Id. at 23; see also Dkt. # 91-10, at ¶ 4, 6 (affidavit from the jail's medical director stating that "[t]he reports from consulting radiologists on the above referenced dates for the x-rays of Savage's left ankle evidence no change since January 20, 2021, in the

---

[12] In response to the motion for summary judgment, Savage asserts that Lemons's assessment of his injuries on April 18, 2021, is "false." Dkt. # 95, at 19. In support, he cites a notation in his medical records indicating that on April 11, 2021, a different nurse ordered "a bottom bunk bottom tier restriction." Id. Savage is correct that the medical record shows this restriction. But this evidence does not controvert Lemons's statements that she found no outward signs of trauma to Savage's wrists, arms, or left ankle one week later following the use of force incident. In any event, Savage testified at his deposition that he was able to walk on April 18, 2021, before the use of force, Dkt. # 91-1, at 21, and other evidence shows he was also able to stand on his left ankle. Dkt. # 91-4.

condition of Savage's left ankle following the April 18, 2021, escort of Mr. Savage from pod J-9").

## II.

The only remaining claim in this case is Savage's claim that Dobbertin and Sanchez each violated his Fourteenth Amendment right to due process by using excessive force against him on April 18, 2021. Dkt. # 37, at 10-12; Dkt. # 51, at 18-20, 25. In support of that claim, Savage alleges that defendants, along with Edwards and Diaz, lifted Savage up from the J-Hall floor, dragged him down the hall, lifted him off the floor, carried him through the booking area, and left him in too-tight handcuffs in the holding cell for several hours without medical attention or access to a bathroom. Dkt. # 37, at 6-7, 11-13, 16; Dkt. # 91-1, at 37-39.

Defendants assert that they are entitled to summary judgment based on qualified immunity. Dkt. # 87 at 8. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). This shield "protects all but the plainly incompetent or those who knowingly violate the law." City of Tahlequah v. Bond, 595 U.S. 9, 12 (2021) (cleaned up).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "dispute about a material fact is 'genuine'" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material when it "might affect the outcome of the suit under the governing [substantive] law." Id. At the summary-judgment stage, the court's task "is not 'to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial.'" Tolan v. Cotton, 572 U.S. 650, 655 (2014) (quoting Anderson, 477 U.S. at 249). In applying the summary-judgment standard, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." Hiatt v. Colo. Seminary, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 997 (10th Cir. 2011)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). Consistent with the plain language of Rule 56(a), the movant bears the ultimate burden to show there are no genuine issues for the jury to resolve and that the movant is entitled to judgment as a matter of law. Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring).

Nonetheless, when a defendant moves for summary judgment based on qualified immunity "[t]he plaintiff first must shoulder a heavy two-part burden." Id. at 1325. In determining whether a plaintiff has met his or her burden to show "(1) that [the] defendant violated a constitutional right and (2) that the right was clearly established, ordinarily courts must 'adopt' plaintiff's 'version of the facts.'" Id. (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). But at the summary-judgment stage "a plaintiff's version of the facts must find support in the record." Id. And the court may reject plaintiff's version of the facts if it is "'so utterly discredited by the record that no reasonable jury could have believed' it." Id. (quoting Scott, 550 U.S. at 380). The court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first," Pearson v. Callahan, 555 U.S. 223, 236 (2009), "and may resolve the question by finding either requirement is not met," Mascorro v. Billings, 656 F.3d 1198, 1204 (10th Cir. 2011).

**III.**

On the record presented, the Court finds that Savage has not met his burden, at the first prong of the qualified immunity analysis, to show that either defendant violated the Fourteenth Amendment.[13] The Fourteenth Amendment's due process clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015) (quoting Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)). A pretrial detainee can establish a due process violation by proving that "the force purposely or knowingly used against him was objectively unreasonable." Id. at 396-97. Under this objective standard, a pretrial detainee need not prove that an officer intended to inflict punishment. Id. at 398. "Rather, . . . a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." Id. But in excessive force cases, even those governed by the Fourteenth Amendment's due process clause, "objective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. at 397 (quoting Graham, 490 U.S. at 396). Several factors "bear on the reasonableness or unreasonableness of the force used," including, but not limited to: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount

---

[13] In response to the motion for summary judgment, Savage argues, in part, that he has already met his two-part burden to overcome defendants' assertion of qualified immunity because this Court determined the qualified immunity question in his favor at the motion-to-dismiss stage. Dkt. # 95, at 1-2, 5-7, 9-10. This Court did reject defendants' assertion of qualified immunity at the motion-to-dismiss stage. Dkt. # 51, at 20-23. But, in so doing, the Court explained that defendants then faced "a more challenging standard of review than would apply on summary judgment" because, at that stage, the Court must accept as true Savage's factual allegations. Id. at 20 (quoting Peterson v. Jensen, 371 F.3d 1199, 1201 (10th Cir. 2004)). As just discussed, at the summary-judgment stage, it is Savage who bears the heavier burden because his version of the facts "must find support in the record" and the Court need not accept his version of the facts if that version is "blatantly contradicted by the record." Thomson, 584 F.3d at 1312.

of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. In considering these factors, courts "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer" and "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." Id. at 399-400.

The summary-judgment record does not support that either Dobbertin or Sanchez used objectively unreasonable force against Savage under the circumstances of this case. Even under Savage's version of events, neither Dobbertin nor Sanchez used any force against him until after: (1) Savage did not comply with Edwards's verbal command to walk faster, (2) Savage twice physically resisted Edwards's one-officer escort by pulling his arm away from Edwards when Edwards held Savage's arm to expedite their trip down the hall, and (3) Edwards forcefully took Savage to the ground. According to Savage, Dobbertin and Sanchez, along with Edwards and Diaz, then essentially acted as a four-officer escort team—with two officers on each side of Savage—by lifting him from the floor and moving him down the hall with his feet sometimes but not always touching the ground. As the group neared the operations desk, all four officers then lifted Savage completely off the ground and carried him through the booking area, thus relieving him of the need to place any weight on his painful left ankle. At some point before they reached the holding cell vestibule, the four-officer escort shifted to a two-officer escort—with Dobbertin and Sanchez no longer touching Savage—and Edwards and Diaz walked Savage into the holding cell after Dobbertin opened the holding cell door.

Savage does not argue, persuasively or otherwise, that the challenged actions of Dobbertin and Sanchez were not related to a legitimate governmental objective. Regardless of his subjective

12

reasons for refusing a verbal command to walk faster and for (twice) pulling his arm away from Edwards, Savage's actions necessitated a response from Edwards and other detention officers to maintain order and security at the jail. Kingsley, 576 U.S. at 399-400 (noting the importance of "acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate"). And Savage has not shown that any actions by Dobbertin or Sanchez involved a use of force that was excessive in relation to the purpose of maintaining order and security at the jail considering the circumstances known to defendants at the time of the use of force. See id. at 397 (noting that courts assessing objective reasonableness of force used against pretrial detainee must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight"); Pauly v. White, 580 U.S. 73, 76-77 (2017) ("Because this case concerns the defense of qualified immunity . . . the Court considers only the facts that were knowable to the defendant officers."). Viewing the defendants' use of force from the perspective of a reasonable detention officer armed with facts that were knowable to Dobbertin and Sanchez, the actions of both defendants were objectively reasonable. Before April 18, 2021, Dobbertin and Sanchez knew that Savage had a history of disobeying orders of detention officers and behaving aggressively toward detention officers. On the night of April 18, 2021, Dobbertin and Sanchez were stationed, respectively, at the booking desk and classifications desk in the booking area near the end of J-Hall, but neither could see J-Hall from their work stations. Accepting Savage's version of the facts to the extent that version is supported by the summary-judgment record, Dobbertin, Sanchez, and Diaz were alerted in some unknown manner to the situation in J-Hall, ran down the hall, and saw that Edwards had Savage on the floor and that Savage was in handcuffs. Dobbertin and Sanchez both state in their affidavits that they were

13

detention officers at the time, that the chain of command required them to follow instructions given by corporals, and that TCSO policy requires noncompliant inmates to be placed in a holding cell to calm down before being placed in restrictive housing. Dkt. ## 91-6, 91-7. Even without any evidence of any specific conversations that may have occurred between the four officers, it is reasonable to infer from the existing evidence in the record that Dobbertin and Sanchez, both of whom were detention officers, were directed either by Edwards or Diaz, both of whom were corporals, to assist with lifting Savage up from the floor and transporting him to the holding cell in the booking area after Savage engaged in a physical altercation with Edwards in J-Hall.

Defendants then effectively acted as part of a four-officer escort team to transport Savage to the holding cell and, in so doing, necessarily tempered the amount of force that each officer had to use to respond to the security risk created by Savage after he actively resisted Edwards's one-officer escort down J-Hall. At some point, all four officers lifted Savage off the ground and carried him and this may have required Dobbertin and Sanchez to use some additional amount of force, but it also benefited Savage by alleviating his need to place weight on his left ankle. And it is clear from the record that when the group reached the holding cell vestibule, neither Dobbertin nor Sanchez had hands on Savage. Dobbertin touched him only three times after he was in the holding cell: twice to remove Savage's handcuffs after he was in the holding cell; and once to replace them for a short period during the stethoscope examination. Giving due consideration to defendants' legitimate interests in maintaining order at the jail, the use of force and the amount of force used by Dobbertin and Sanchez under these circumstances was objectively reasonable and did not violate the Fourteenth Amendment.

Further, to the extent Savage alleges that either Dobbertin or Sanchez could be liable for violating the Fourteenth Amendment's due process clause by keeping him in the holding cell in

14

too-tight handcuffs, refusing his pleas for medical attention, and denying him access to a bathroom, the Court rejects Savage's version of the facts because it is blatantly contradicted by the record. As previously discussed, Savage was placed in the holding cell, with access to a toilet, at 11:19 p.m.; Dobbertin removed Savage's handcuffs at 11:43 p.m.; a nurse examined Savage two minutes later, observing no injuries to his wrists or ankles; and a second nurse examined Savage at 2:16 a.m. when he was placed in restrictive housing, observing that he had only a tiny cut on his finger. Not only do these facts contradict Savage's version of how defendants treated him after he was placed in the holding cell and his description of the injuries he sustained when he was escorted to the holding cell, but also they fail to suggest, let alone support, that either Dobbertin or Sanchez violated his right to due process through any actions or omissions on their part after they used objectively reasonable force to transport him to the holding cell.

## IV.

Based on the foregoing analysis, the Court concludes that Savage has not met his burden to show that either Dobbertin or Sanchez violated his Fourteenth Amendment right to due process. The Court thus finds that Dobbertin and Sanchez are entitled to qualified immunity and grants defendants' motion for summary judgment.

**IT IS THEREFORE ORDERED** that:

1. defendants' motion for summary judgment (Dkt. # 87) is **granted** based on qualified immunity;

2. all remaining pretrial deadlines, the April 14, 2025, pretrial conference, and the May 5, 2025, jury trial are **stricken**;

3. Savage's motion for appointment of counsel (Dkt. # 106) is **denied as moot**;

4. this is a final order terminating this case; and

5. a separate judgment shall be entered herewith.

**DATED** this 7th day of April, 2025.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE